IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 1:16-cr-321** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **JEROME KING** | : | **Judge Sylvia H. Rambo** |

## M E M O R A N D U M

Before the court is Defendant's amended motion to suppress physical

evidence seized by the police and statements made after his arrest. (Doc. 39).

Specifically, Defendant moves to suppress the shotgun and other contraband seized

from Apartment 4 of the apartment building located at 1250 Kittatinny Street,

Harrisburg, Pennsylvania, as well as the incriminating statements he made to

police at the Harrisburg Hospital following his arrest. (*Id.*) After careful

consideration, the court will deny Defendant's motion in its entirety.

## I.     Background

On November 2, 2016, Defendant Jerome King ("Defendant") was

charged in a two-count indictment with being a felon in possession of a firearm in

violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count 1), and possession of an

unregistered shotgun having a barrel length of less than eighteen inches and not

identifiable by serial number, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871

(Count 2). (Doc. 1). Defendant entered a plea of not guilty to the charges on November 8, 2016. (Doc. 12).

On January 13, 2017, Defendant filed a motion to suppress physical evidence and statements (Doc. 24), and later amended that motion to add an additional basis for suppression, (*see* Doc. 39). In the amended motion to suppress, Defendant argues that the police officers had no reasonable suspicion to detain him, lacked a legal basis to enter Apartment 4 and seize the shotgun, and lacked probable cause to arrest him without a warrant. (Doc. 39 at 2). He further contends that any statements he made at the hospital were in violation of *Miranda*, and any other contraband seized from the apartment after the comprehensive police search must be excluded as fruit of the poisonous tree due to the prior unlawful police conduct. (*Id.*)

The Government filed a brief in opposition (Doc. 29) to Defendant's motion to suppress on January 27, 2017, and a brief in opposition (Doc. 52) to his amended motion to suppress on April 7, 2017. In its briefing, the Government primarily argues that (1) Defendant's initial detainment was supported by reasonable suspicion; (2) the warrantless shotgun seizure was supported by an exception to the warrant requirement; (3) the warrantless arrest of Defendant was lawful because it was based on probable cause that he had committed a felony; and (4) Defendant's post-arrest statements are admissible because one of the statements

was not the product of interrogation and therefore *Miranda* is inapplicable, and because, for any statement to which *Miranda* does apply, Defendant was advised of his *Miranda* rights, validly waived those rights, and made voluntary statements.

The court held an evidentiary hearing on the motion on April 11, 2017. Following the hearing, the court permitted the parties to file supplemental briefing on their respective positions. Defendant filed his supplemental brief on May 4, 2017, (Doc. 61), and the Government filed its supplemental brief on May 15, 2017, (Doc. 63). Defendant filed a second supplemental brief on June 5, 2017, (Doc. 73), and the Government filed a brief in response on June 8, 2017, (Doc. 74). The matter is now ripe for disposition.

## II.  **Findings of Fact**[1]

Harrisburg Bureau of Police Corporal Brian Henry ("Corporal Henry"), Corporal Scott Johnsen ("Corporal Johnsen"), Patrol Officer Brent Roadcap ("Officer Roadcap"), and Patrol Officer Jeremy Crist ("Officer Crist"), testified on behalf of the Government regarding the circumstances surrounding Defendant's arrest and the search of Apartment 4 at 1250 Kittatinny Street. Those circumstances are as follows.

---

[1] Unless otherwise noted, the following factual account represents the facts the court credits upon consideration of the testimony and evidence presented during the evidentiary hearing on April 11, 2017.

On July 6, 2016, at approximately 4:20 p.m., Corporal Henry responded to a police dispatch regarding a 911 call reporting that a man in the area of 1250 Kittatinny Street was brandishing a shotgun and threatening people in the vicinity. (Doc. 67, Tr. of Hr'g on Mot. to Suppress [hereinafter "Doc. 67"], at 5, 47). This area is located in the Allison Hill neighborhood of Harrisburg, Pennsylvania, which Corporal Henry and Corporal Johnsen both described as a high crime area that produces frequent police calls, often regarding firearms and drugs. (Doc. 67 at 5, 46-47). The identified 911 caller explained that the man with the shotgun was a neighbor, describing him as "a black male in his 20's to 30's . . . wearing a black and white baseball hat, no shirt, black shorts, and black, red, and white sneakers." (*Id.* at 5-6, 18; *see also id.* at 62 (including in the caller's description that the shoe brand was "Nike")).

Corporal Henry was the first officer on the scene, and, while waiting nearby in his car for backup, observed a male matching the 911-caller description. (*Id.* at 7). When Corporal Johnsen arrived, the two officers drove towards 1250 Kittatinny Street from opposite directions, and as they pulled up the male matching the 911-caller description ran up the fire escape attached to 1250 Kittatinny Street and entered the building. (*Id.* at 7-8, 48). Neither officer observed a weapon on the male suspect at that time. (*Id.* at 20, 55). Upon exiting their vehicles, the officers saw a woman emerge from the same building, who identified herself as

Shawnelle Robinson. (*Id.* at 8). They asked Ms. Robinson who the man was that had just run into the building. (*Id.*) When she responded "Jerome," the officers asked Ms. Robinson to summon "Jerome" out of the apartment, which she did. (*Id.*) When the male—later identified as Jerome King—emerged from the building he was putting on a shirt. (*Id.* at 8, 48).

As soon as King exited the building and walked down the stairs, Corporal Johnsen patted him down for weapons but did not find any. (*Id.* at 48-49). Corporal Johnsen then had King sit and wait on the steps at the bottom of the fire escape. (*Id.* at 49). Corporal Henry testified that during this initial contact with King and Ms. Robinson, he had observed several small children—all under the age of six—standing on the fire-escape landing and looking fearful, and that the children had eventually gone back inside the building. (*Id.* at 8-9, 11, 49). Corporal Henry decided to enter the building to make sure the children were not in danger and to check for weapons on the fire escape landing and inside the doorway. (*Id.* at 11). He took the same path up the fire escape and into the building that King had originally taken when the officers had first arrived on the scene. (*Id.* at 11-12).

Upon entering the apartment building through the open door to the fire escape, Corporal Henry saw a hallway with a staircase and two apartment doors: the door to Apartment 3, which was facing the fire-escape entrance and a little to

5

the left, was closed; the door to Apartment 4, which was to the right of the fire-escape entrance, was open. (*Id.* at 12; Government's Ex. 3). While standing in the common hallway, he looked into Apartment 4 through its open door and saw the same children inside the apartment "huddled together" and "still look[ing] like they were scared." (Doc. 67 at 12-13). Also through the open apartment door, Corporal Henry observed a partially covered shotgun lying on a piece of furniture directly inside the apartment doorway. (*Id.* at 14). Upon seeing the shotgun, he radioed down to Corporal Johnsen the code "1015," indicating that King should be taken into custody. (*Id.*) Corporal Henry then entered Apartment 4 and retrieved the shotgun.[2] (*Id.*)

After Corporal Henry had secured the shotgun in the trunk of his patrol vehicle, he sought written consent from Ms. Robinson to search Apartment 4. (*Id.* at 16). She consented in writing to the search. (*Id.* at 17). The officers found and

___

[2] Defendant points to a July 6, 2016 police report from Officer Roadcap to assert that when Corporal Henry first observed the shotgun, he was standing inside Apartment 4, rather than in the common hallway. (*See* Doc. 73 at 1 & Doc. 73-1). The facts, as the court finds them, indicate otherwise. Officer Roadcap's report shows that, at the time the report was made, he mistakenly thought the entire second floor of the building was one apartment that could be accessed directly from the fire escape. (*See* Doc. 73-1 ("[Corporal] Henry and I then went up the fire escape to the *second floor apartment* to check on the children that were observed by [Corporal] Henry.") (emphasis added)). In fact, the fire-escape door that Officer Roadcap saw Corporal Henry enter leads to the common hallway for Apartment 3 and Apartment 4. (*See* Doc. 67 at 12; Government's Ex. 3). Officer Roadcap's testimony further establishes that when Corporal Henry first saw the shotgun, he was standing inside the entrance to the apartment building, not the apartment unit: upon direct questioning regarding the potential ambiguity in the report where it states that Corporal Henry was standing "inside the doorway," Officer Roadcap clarified that Corporal Henry was standing inside "[t]he apartment *building* doorway," not the apartment unit doorway. (Doc. 67 at 37 (emphasis added)).

seized approximately $800 in cash, several bags of synthetic marijuana, shotgun ammunition, small sandwich baggies, and rubber bands. (*Id.*)

In the meantime, immediately upon receiving the 1015 code from Corporal Henry, Corporal Johnsen attempted to handcuff King, but King pulled away from the officer's grasp and started running. (*Id.* at 49-50). Corporal Johnsen gave chase, providing multiple commands to stop and multiple "ta[s]er commands." (*Id.* at 51). When King failed to respond to the commands, Corporal Johnsen tased him, with the taser prongs lodging in the middle of King's back and in the back of his head. (*Id.*) King fell to the ground and suffered significant injuries,[3] at which time the officers handcuffed him and called for an ambulance. (*Id.* at 51-52). King was taken to Harrisburg Hospital in the custody of Officer Crist. (*Id.* at 53, 66).

Officer Crist accompanied King in the ambulance to the hospital, and testified that King had responded coherently to the medics' questions during the trip. (*Id.* at 66-67). Upon arrival at the hospital and placement in an emergency room ("Red Room 20"), Officer Crist informed King that he was under arrest, and that he was a prisoner receiving medical attention. (*Id.* at 67). He also provided King with *Miranda* warnings, and King responded that he understood his *Miranda* rights. (*Id.*)

---

[3] At the hospital, King was diagnosed with, among other injuries, a fractured skull, multiple facial fractures, and a concussion. (Def.'s Ex. 212 at D000258, D000489, D000490).

King was "agitated and restless" upon admission to the hospital. (Def.'s Ex. 212 at D000243-44; Doc. 67 at 79). Due to his agitated condition and the need for a CT scan, he was given "2 mg of Ativan for sedation." (Def.'s Ex. 212 at 000244-45; Doc. 67 at 80). The treating nurse testified that Ativan can cause "drowsiness" and "sleepiness," (Doc. 67 at 80), and that he would not recommend the operation of heavy machinery or the execution of a contract if one experienced those effects, (*id.*).

Following this initial treatment, King was taken for a CT scan with Officer Crist accompanying him, after which they returned to Red Room 20. (*Id.* at 68). Officer Crist was then informed by Corporal Johnsen of the charges against King. (*Id.* at 69). Sometime thereafter, King asked Officer Crist what his charges were. (*Id.* at 69, 76). Officer Crist advised King of the charges of which he was aware, including possession of a firearm. (*Id.*) King then told Officer Crist, "I knew I had no business with that gun." (*Id.* at 70). Officer Crist told King he did not have to discuss the matter, and again reminded King of his *Miranda* rights. (*Id.*) Officer Crist then asked King if he owned the shotgun, and King replied that he did not own it. (*Id.*) King also questioned Officer Crist regarding where the gun was found, and Officer Crist told him it was found in Apartment 4, to which King responded that the police had no business being in his apartment. (*Id.*)

Officer Crist also informed King that synthetic marijuana was found in the apartment, and King initially denied that it was his. (*Id.* at 71) Upon further questioning regarding the identity of the other apartment residents, King admitted that it was his synthetic marijuana. (*Id.*)

### III.  **Discussion**

In his motion to suppress, Defendant argues that the physical evidence recovered from his residence (Apartment 4), as well as the statements he made to Officer Crist at the hospital, were obtained in violation of his Fourth and Fifth Amendment rights and must be suppressed.

"On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005) (citation omitted). The applicable burden of proof is by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (citation omitted).

In order to admit statements made during custodial interrogation subsequent to the provision of *Miranda* warnings, the defendant must have validly waived his Fifth Amendment rights and the statements must have been voluntary. *United States v. Naranjo*, 426 F.3d 221, 227 (3d Cir. 2005). When the issue of waiver of *Miranda* rights arises on a motion to suppress, the government bears the

burden of proving by a preponderance of the evidence that (1) the defendant was

properly advised of his *Miranda* rights; (2) the defendant voluntarily, knowingly,

and intelligently waived his rights; and (3) the ensuing statements were made

voluntarily. *Colorado v. Connelly*, 479 U.S. 157, 169 (1986); *United States v.

Jacobs*, 431 F.3d 99, 108-09 (3d Cir. 2005).

### A.    Defendant's Investigative Detention

Defendant first argues that the police did not have reasonable suspicion

to detain him when he exited the building in response to Ms. Robinson's request.

The Government responds that initially, because the brief stop-and-frisk performed

by Corporal Johnsen did not result in the seizure of evidence, the question of the

constitutionality of the detention is irrelevant for suppression purposes. The

Government also argues that there was sufficient justification for Defendant's brief

detention.

As opposed to requiring probable cause for an arrest, a "brief

investigative detention is permissible if 'the police officer [can] point to specific

and articulable facts, which, taken together with rational inferences from those

facts, reasonably warrant [the] intrusion,'" *i.e.*, "raise a suspicion that the particular

individual being stopped is engaged in wrongdoing." *United States v. Navedo*, 694

F.3d 463, 467-68 (3d Cir. 2012) (alterations in original) (quoting *Terry v. Ohio*,

392 U.S. 1, 30 (1968) and *United States v. Cortez*, 449 U.S. 411, 418 (1981)). "In

evaluating whether reasonable suspicion existed, a court 'must consider the totality of the circumstances, including the police officer's knowledge, experience, and common sense judgments about human behavior.'" *Id.* at 468 (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)). "Reasonable suspicion . . . unequivocally demands that 'the detaining officer[ ] must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (citation omitted).

Here, Defendant argues that the officers lacked reasonable suspicion to detain him, and "[b]ecause the detention was unlawful, all evidence obtained subsequent to that unlawful detention should be excluded." (Doc. 61 at 9). Defendant's argument misses the mark for two reasons.

First, the facts show that Corporal Johnsen had reasonable suspicion to detain Defendant. The identified 911 caller gave a detailed description of personally observed events, and included the age, race, clothing, absence of shirt, and location of a person threatening others with a shotgun. The incident took place in a high crime area, known for frequent police calls regarding firearms and drugs. Corporal Johnsen observed Defendant, who matched the description given by the 911 caller, enter the apartment building via the fire escape when the police approached, and when Defendant emerged a short time later he was putting on a shirt. These facts provide a particularized and objective basis for suspecting that

Defendant was involved in criminal activity—threatening others with a shotgun—such that Corporal Johnsen's brief detention of Defendant was justified.

Defendant's reliance on *United States v. Brown*, 448 F.3d 239 (3d Cir. 2006), is misplaced. In *Brown*, the suspects who were wrongly detained barely matched the description provided by the radio broadcast—in fact, only their race was consistent with the description provided. *Id.* at 247-48. Here, Defendant matched almost every single detail of the 911 caller's description, including race, age-range, the color of shorts, lack of shirt, color of hat, and brand and color of sneakers. Moreover, contrary to the instant case, the suspects in *Brown* were not detained in a high crime area, nor was the tip provided by someone who had actually observed the crime in question. Thus, in *Brown*, the officers lacked reasonable suspicion that the suspects they detained were involved in illegal activity. *Id.* at 250-51. Here, however, that is simply not the case.

In sum, the facts show that Corporal Johnsen had reasonable suspicion that Defendant was involved in wrongdoing, such that Defendant's brief detention was justified. Furthermore, because the alleged criminal activity at issue involved the brandishing of a shotgun, a pat down, or "*Terry* frisk," for weapons was also justified for officer safety.

Even if the detention were unreasonable and in violation of Defendant's Fourth Amendment rights, because no evidence was obtained from the *Terry* frisk,

and no future search or seizure was unlawfully tainted by the detention, suppression of the evidence does not obtain. *See United States v. Roby*, 122 F.3d 1120, 1124 (8th Cir. 1997) (explaining that even though detention was improper, because "no evidence was obtained from this brief encounter or used to support the search warrant affidavit," suppression was an inappropriate remedy because "while the tree may have been poisonous, it bore no fruit").  Contrary to Defendant's assertion, a Fourth Amendment violation does not forever taint subsequent law enforcement activity such that all future evidence seized must be excluded.

Rather, "the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which objection is made has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).  As the Third Circuit has explained, "a single Fourth Amendment violation does not taint an entire case, but only the evidence uncovered as a result of that violation." *United States v. Mosley*, 454 F.3d 249, 254 (3d Cir. 2006).  In other words, there must be a causal connection between the illegal conduct and the evidence sought to be suppressed. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) ("Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the

constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." (citation and internal quotation marks omitted)).

As will be discussed in more detail below, intervening events clearly interrupted any connection between the allegedly unlawful detainment and the evidence that Defendant now seeks to suppress. Therefore, because the brief investigatory detainment of Defendant was lawful, and because suppression would not obtain in these circumstances even if the detention were unlawful, Defendant's first argument for suppression fails.

### B. Defendant's Warrantless Arrest

Defendant next argues that the officers lacked probable cause to arrest him without a warrant. The facts of this case, however, show that this argument is meritless.

The Fourth Amendment establishes that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV. Not all searches and seizures require the issuance of a warrant. Rather, the Fourth Amendment merely proscribes those searches or seizures—with or without a warrant—that are unreasonable.

In *United States v. Watson*, 423 U.S. 411 (1976), the Supreme Court of the United States held that a warrantless arrest is reasonable so long as the law

enforcement official has probable cause to believe that a felony has occurred.  The

*Watson* court summarized as follows:

> Law enforcement officers may find it wise to seek arrest
> warrants where practicable to do so, and their judgments
> about probable cause may be more readily accepted
> where backed by a warrant issued by a magistrate.  But
> we decline to transform this judicial preference into a
> constitutional rule when the judgment of the Nation and
> Congress has for so long been to authorize warrantless
> public arrests on probable cause rather than encumber
> criminal prosecutions with endless litigation with respect
> to the existence of exigent circumstances, whether it was
> practicable to get a warrant, whether the suspect was
> about to flee, and the like.

*Watson*, 423 U.S. at 423-24 (citations omitted).  "[P]robable cause to arrest exists

when the facts and circumstances within the arresting officer's knowledge are

sufficient in themselves to warrant a reasonable person to believe that an offense

has been or is being committed by the person to be arrested."  *Goodwin v. Conway*,

836 F.3d 321, 327 (3d Cir. 2016) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480,

483 (3d Cir. 1995)).

The facts in this case plainly show that the police had probable cause to

arrest Defendant without a warrant.  First, Defendant matched the detailed 911-

caller description of a man brandishing a shotgun and threatening people in a high

crime area.  Second, Defendant ran into the building via the fire escape when

police officers arrived, and then exited the building a short time later after being

summoned by Ms. Robinson.  Third, when Corporal Henry followed Defendant's

path up the fire escape and entered the common hallway of the apartment building, he observed—through the only open apartment door—a partially covered shotgun on a piece of furniture. This discovery corroborated the 911 caller's tip regarding the incident. Finally, and most importantly, when Corporal Johnsen attempted to take Defendant into custody, Defendant pulled away and fled, resulting in a foot chase and the eventual taser incident.

These facts, taken together, establish probable cause to arrest. It is well settled that "where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest." *United States v. Laville*, 480 F.3d 187, 195 (3d Cir. 2007). The police officers here most likely had probable cause to arrest Defendant before he fled; after he took flight, any such doubt was removed. Consequently, the warrantless arrest of Defendant was proper, and does not support the suppression of evidence.

### C.  The Warrantless Seizure of the Shotgun

Defendant also challenges the constitutionality of the warrantless entrance into Apartment 4 and the associated seizure of the shotgun. For the following reasons, Corporal Henry's actions in entering the apartment and seizing

the shotgun without a warrant were objectively reasonable under the Fourth Amendment.

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (citation omitted). Because of the special protections afforded to the home, *see id.* at 585-86, even if a law enforcement agent has probable cause to believe that contraband is present within a home, a search warrant is required unless there are exigent circumstances that would make a warrantless entrance and seizure reasonable, *Horton v. California*, 496 U.S. 128, 137 n.7 (1990) ("Incontrovertible testimony of the senses that an incriminating object is on the premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure" absent exigent circumstances).[4]

Several exigencies have been established to overcome the presumption of unreasonableness and thereby justify a law enforcement agent's warrantless entry into a home. *Kentucky v. King*, 563 U.S. 452, 459-60 (2011). These exigencies include the "emergency aid" exception, the "hot pursuit" exception, and the

---

[4] It is for this reason that the court rejects the Government's "plain view doctrine" argument. (*See* Doc. 63 at 18-19). While the shotgun may certainly have been in "plain view" of Corporal Henry from where he stood in the common hallway, in order to have a lawful right of access to the shotgun inside Defendant's apartment, *Horton*, 496 U.S. at 137, an exigency must have existed to permit Corporal Henry's warrantless entry into the home.

"imminent destruction of evidence" exception. *Id.* at 460. The Government bears the burden of demonstrating that exigent circumstances existed. *United States v. Mallory*, 765 F.3d 373, 383 (3d Cir. 2014) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)). Of the exigencies listed, only the emergency aid exception is relevant under the instant circumstances.

According to the emergency aid exception, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). The circumstances must provide "an objectively reasonable basis for believing . . . that a person within [the house] is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (alteration in original) (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). "Circumstances involving the protection of a child's welfare, even absent suspicions of criminal activity, may present an exigency permitting warrantless entry, but only if the officer reasonably believes that someone is in *imminent* danger." *Ray v. Township of Warren*, 626 F.3d 170, 177 (3d Cir. 2010) (citation and internal quotation marks omitted).

Defendant argues that no exigency existed to permit the warrantless entry into the apartment to seize the shotgun. He contends, somewhat troublingly, that Corporal Henry's actions—despite the presence of multiple young children—were unwarranted. (Doc. 61 at 15-16). Defendant reasons,

> Although the officers saw children in the apartment, the officers did not testify to seeing the children toying with [the shotgun]. The officers never asked the children to step outside of the apartment and away from the gun. Had the officers removed the children or asked the mother to remove the children, they could have taken the steps necessary to convince a judicial officer to issue a warrant.

(*Id.*) The court strongly disagrees with Defendant's position.

"The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-99 (1967). It follows that the Fourth Amendment does not require children to be "toying with" a shotgun before a police officer is reasonably permitted to make a warrantless entry into an apartment to secure the firearm; the children's presence and proximity to the shotgun are reason enough. *See Ray*, 626 F.3d at 177; s*ee also United States v. Belisle*, 164 F. App'x 657, 661-62 (10th Cir. 2005) (affirming district court finding of exigent circumstances permitting the warrantless entry into an apartment based only on statement that "a gun and various individuals were in the apartment in the presence of a young child"). As such, the emergency aid exception to the warrant requirement applies, and therefore Corporal Henry's warrantless entry into the

apartment and the associated seizure of the shotgun were reasonable under the Fourth Amendment.[5]

### D.    Defendant's Statements to Officer Crist

Finally, Defendant argues that the inculpatory statements made to Officer Crist at the hospital must be suppressed, as they were allegedly obtained in violation of Defendant's Fifth Amendment privilege against self-incrimination. Specifically, Defendant claims that, because of his medical condition, he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights.  He also claims that any statements given were involuntary.  Thus, according to Defendant, his statements must be excluded.

The Fifth Amendment to the United States Constitution contains an individual privilege against self-incrimination, and *Miranda v. Arizona*, 384 U.S. 436 (1966), provides a mechanism to safeguard that privilege.  *Id.* at 467 ("In order . . . to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.").  It is well settled that

---

[5] Defendant does not challenge the written consent to search the apartment provided by Ms. Robinson that produced the money, ammunition, and synthetic marijuana.  Rather, he appears to argue that because the initial entry into the apartment was allegedly tainted, the search and seizures made after receipt of written consent were also tainted and require suppression.  But as explained above, *see* Section III. A., a Fourth Amendment violation does not necessarily taint every subsequent police action.  Defendant does not explain how an allegedly tainted entry and seizure of the shotgun would necessarily require the suppression of the evidence subsequently seized after the police received written consent to search from Ms. Robinson.

*Miranda* rights do not attach until there is "custodial interrogation." *Id.* at 444.

When a suspect is in custody and before he is interrogated, he must be fully

informed of the "State's intention to use his statements to secure a conviction,"

*Moran v. Burbine*, 475 U.S. 412, 420 (1986), and of his rights to remain silent and

to have counsel present, *Miranda*, 384 U.S. at 469.

The accused may waive these rights verbally or in writing, so long as he

makes "a deliberate choice to relinquish the protection those rights afford." *United*

*States v. Whiteford*, 676 F.3d 348, 362 (3d Cir. 2012) (quoting *Berghuis v.*

*Thompkins*, 560 U.S. 370, 385 (2010)). When the issue of waiver arises on a

motion to suppress statements, the Government bears the burden of proving by a

preponderance of the evidence that (1) the defendant was properly advised of his

*Miranda* rights; (2) the defendant voluntarily, knowingly, and intelligently waived

his rights; and (3) the ensuing statements were made voluntarily. *Colorado v.*

*Connelly*, 479 U.S. 157, 169 (1986); *United States v. Jacobs*, 431 F.3d 99, 108-09

(3d Cir. 2005); *see also United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005)

("A defendant may waive his *Miranda* rights if the waiver is made knowingly,

intelligently, and voluntarily.")

A court will first inquire whether "the relinquishment of the right was

voluntary in the sense that it was the product of a free and deliberate choice," and

whether the waiver was "made with a full awareness of both the nature of the right

being abandoned and the consequences of the decision to abandon it." *Moran*, 475 at 421. Factors relevant to determining whether a statement is voluntary include: whether the police engaged in coercive activity; the length, location, and continuity of the interrogation; the age, education, physical and mental condition of the defendant; and whether *Miranda* rights were given. *See Withrow v. Williams*, 507 U.S. 680, 693 (1993).

The crucial factor in a voluntariness inquiry is that of police coercion. A confession must not have been "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight." *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citations omitted). Similarly, a law enforcement officer's words or deeds that are likely to cause a suspect to believe he will suffer serious adverse consequences if he does not cooperate, or will receive substantial leniency if he does, can render a confession involuntary. *See United States v. Walton*, 10 F.3d 1024, 1028-29 (3d Cir. 1993).

### 1. *Defendant's Statement Before* **Miranda** *Rights Attached*

It is undisputed that Defendant was in custody during his time at Harrisburg Hospital. It is also undisputed that upon admission to the hospital, Officer Crist informed Defendant of his arrest and provided him with *Miranda* warnings, to which Defendant responded that he understood his rights.

But in order to assert a violation of one's *Miranda* rights, those rights necessarily must have attached, and this attachment does not take place until there is both custody and interrogation. *See Miranda*, 384 U.S. at 444; *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980); *see also Saranchak v. Beard*, 616 F.3d 292, 303 (3d Cir. 2010). Here, after returning from the CT scan, Defendant asked Officer Crist what his charges were, and Officer Crist answered Defendant's question and included the charge of possession of a firearm. Defendant then offered up the statement, "I knew I had no business with that gun." (Doc. 67 at 70). This statement was not the product of interrogation by Officer Crist; it was a declaratory response to a question posed and initiated by Defendant. As such, even though *Miranda* warnings had been given, Defendant's *Miranda* rights were not violated due to the simple fact that they had not yet attached. Consequently, suppression of this statement does not obtain. *See, e.g.*, *United States v. Rodgers*, No. 212-cr-162, 2014 WL 2195409, at *4 (W.D. Pa. 2014) (citing *United States v. Jackson*, 863 F.2d 1168, 1172 (4th Cir. 1989)) (explaining that police officer's declaratory response to questions initiated by defendant regarding potential criminal charges was not functional equivalent of interrogation and therefore *Miranda* warnings were not required).

## 2. *Defendant's Statements After* **Miranda** *Rights Attached*

After the above exchange, Officer Crist again informed Defendant of his *Miranda* rights and explained to him that he did not have to talk about the incident. Officer Crist then initiated questioning (*i.e.*, interrogation), asking Defendant if he owned the shotgun, to which Defendant replied that he did not. Defendant also asked Officer Crist where the gun was found, and Officer Crist responded that it was found in Defendant's apartment, to which Defendant responded that the police had no business being in his apartment. Officer Crist also asked Defendant if the synthetic marijuana was his, and Defendant eventually admitted that it was his marijuana.

Conceding that *Miranda* warnings had properly been given, Defendant argues that he did not knowingly and voluntarily waive his *Miranda* rights due to his medical condition at the time of the custodial interrogation. In his post-hearing supplemental briefing, Defendant also raises, for the first time, the argument that his statements were involuntary due to his injuries and the administration of Ativan. (Doc. 61 at 18). Neither of Defendant's arguments is supported by the record.

First, nothing in the suppression-hearing testimony or medical records indicates that Defendant was unable to make, or failed to make, a knowing, voluntary, and intelligent waiver of his *Miranda* rights, which had been twice

provided to him. Such a waiver was implicitly made when, after being provided with *Miranda* warnings and acknowledging that he understood them, Defendant continued talking with Officer Crist, answering Officer Crist's questions, and asking questions of his own. *See Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (holding that prosecution does not need to show accused made explicit *Miranda* waiver, only that *Miranda* warning was given, it was understood, and accused impliedly waived his right to remain silent by making an uncoerced statement).

The facts show that Defendant's waiver was knowingly, intelligently, and voluntarily made. Officer Crist's unrebutted testimony established that Defendant conversed coherently with EMS staff, medical staff, and with him. Defendant articulated to Officer Crist that he understood his rights. Although the medical records show that Defendant was agitated and uncooperative upon admission, thus requiring the Ativan injection, nothing in the records indicates that Defendant was confused or communicating incoherently. In fact, the medical records indicate that Defendant's judgment was "normal," that he was "oriented to person, place, and time," that his speech was normal, and that he was "following commands." (Def.'s Ex. 212 at D000244). The administering nurse testified that Ativan can cause drowsiness and that operating heavy machinery and entering into contracts would be contraindicated if experiencing those effects, (Doc. 67 at 80), but also testified that people who take Ativan can still engage in conversation, (*id.* at 81).

Second, nothing in the record indicates that Defendant's statements were involuntary. Nearly all of the factors provided in *Withrow v. Williams* cut against Defendant's position. There does not appear to have been any coercive activity by Officer Crist, the length of the interrogation was short, the location of the interrogation was a hospital room rather than a police barracks or prison cell, Defendant is of a mature age, and *Miranda* rights were given multiple times. The only factor in Defendant's favor is that he had suffered significant head injuries and had been given Ativan, but the record demonstrates that his ability to communicate intelligently with Officer Crist and the medical staff remained unimpaired.

In sum, the record evidence is more than sufficient to conclude that Defendant freely and deliberately relinquished his Fifth Amendment rights against self-incrimination, and that the subsequent statements he made were voluntary. Accordingly, Defendant's request to suppress the statements made to Officer Crist at the hospital will be denied.

## IV.    Conclusion

After consideration of all the circumstances, the court finds that the Government has proven by a preponderance of the evidence that (1) Defendant was lawfully detained; (2) Defendant was lawfully arrested; (3) Corporal Henry lawfully entered Apartment 4 and seized the shotgun; and (4) Defendant was fully

advised of and waived his *Miranda* rights, and that his statements were made voluntarily. Accordingly, the court will deny Defendant's amended motion to suppress in its entirety.

An appropriate order will issue.

 s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated: June 9, 2017